IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**GREYHOUND LINES, INC.**
350 North Saint Paul Street
Dallas, Texas 75201,

        Plaintiff,

    *v.*

**ADIRONDACK TRANSIT LINES, INC.**
499 Hurley Avenue
Hurley, New York 12443,

**PINE HILL-KINGSTON BUS CORP.**
499 Hurley Avenue
Hurley, New York 12443, and

**PASSENGER BUS CORPORATION**
499 Hurley Avenue
Hurley, New York 12443,

        Defendants.

Civil Action No. _____15cv8109_____

**COMPLAINT & PETITION TO
CONFIRM ARBITRATION AWARD**

**TRIAL BY JURY DEMANDED**

Plaintiff Greyhound Lines, Inc. brings this action against Defendants Adirondack Transit Lines, Inc.; Pine Hill-Kingston Bus Corp.; and Passenger Bus Corporation seeking confirmation of an arbitration award pursuant to the Federal Arbitration Act, money damages, equitable relief, and declaratory judgments.

## SUMMARY

1.    Since 1997, Greyhound and Adirondack have coordinated their operations and shared revenues on certain intercity bus routes throughout New York State. The companies have recently come into a number of disputes about their rights and obligations under the contract governing that relationship. After trying unsuccessfully to resolve their disputes through

negotiations, the companies submitted demands for arbitration to the American Arbitration Association in the District of Columbia. Arbitrator Elliot Polebaum held an evidentiary hearing from May 4 through May 8, 2015. On October 14, 2015, the Arbitrator issued an award in favor of Greyhound in part and in favor of Adirondack in part. Certain parts of the award are binding, and certain parts of it are nonbinding. Greyhound brings this action to confirm a binding part of that award and to resolve continuing disputes over some nonbinding parts of that award.

## PARTIES

2.     Plaintiff Greyhound Lines, Inc. (referred to herein as "Greyhound") is an intercity bus carrier operating throughout the United States and in Canada and Mexico. It is incorporated in the State of Delaware and has its principal place of business in Dallas, Texas.

3.     Defendants Adirondack Transit Lines, Inc.; Pine Hill-Kingston Bus Corp.; and Passenger Bus Corporation (collectively referred to herein as "Adirondack") are affiliated intercity bus carriers operating mostly in New York State and also parts of Pennsylvania and Québec, Canada. All three companies are incorporated in the State of New York and have their principal place of business in Hurley, New York.

## JURISDICTION & VENUE

4.     This Court has subject-matter jurisdiction over this action because it is between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(a), (c).

5.     Venue is proper in this district because a substantial part of the events giving rise to Greyhound's claim occurred in this district. *See* 28 U.S.C. § 1391(a)(2).

# BACKGROUND

6.      The disputes between Greyhound and Adirondack primarily concern the application of an 18-year-old contract establishing and governing their revenue pooling relationship. This complaint follows a nearly three-year arbitration proceeding concerning those disputes.

### A.      The Greyhound-Adirondack Revenue Pool.

7.      In the late 1990s, Greyhound and Adirondack entered into a revenue pool covering specified intercity bus routes in New York State (the "Pool"). Greyhound and Adirondack each operate a set percentage of miles on the Pool routes and split the ticket revenues from those routes according to set percentages.

8.      The purpose of the Pool was to grow revenue for Greyhound and Adirondack in the face of what were then poor economic conditions for intercity bus carriers. At the time, customer demand for intercity bus travel was at an all-time low, and the industry was adjusting to the effects of deregulation and recovering from a series of labor strikes. The Pool was intended to align Greyhound's and Adirondack's interests to that they could eliminate inefficient, duplicative schedules and bring their operations in line with low demand.

9.      Intercity bus carriers may enter into revenue pools under the federal Motor Carrier Act, which allows them to obtain an exemption from antitrust laws upon application to and approval from the Surface Transportation Board ("STB"), a body within the United States Department of Transportation. The STB may approve a pool so long as both carriers consent to it, it "will be in the interest of better service to the public or of economy of operation," and it "will not unreasonably restrain competition." 49 U.S.C. § 14302(b).

10.     Greyhound and Adirondack signed a Revenue Pooling Agreement in early May 1997. They jointly submitted their revenue pooling application to the STB on May 16, 1997, and the STB approved it on December 11, 1997.

11.     The Pool covers routes between (1) Albany, New York and New York City; (2) Buffalo, New York and New York City; (3) Buffalo, New York and Albany, New York; (4) Albany, New York and Long Island, New York; and (5) New York City and the Canadian border towards Montreal, Quebec.

**B.      The Arbitration between Greyhound and Adirondack**

12.     In the last few years, Greyhound and Adirondack have come into a number of disputes about their rights and obligations under the Revenue Pooling Agreement.

13.     After Greyhound and Adirondack proved unable to resolve these disputes through negotiations, they invoked the arbitration clause at Paragraphs 4 and 23 of their Revenue Pooling Agreement and filed demands for arbitration with the American Arbitration Association in the District of Columbia.

14.     The arbitration clause states that disputes between the parties are subject to mandatory arbitration in the District of Columbia and that any resulting arbitration award is generally nonbinding unless the parties have agreed otherwise. Paragraph 23 states, in pertinent part:

> 23.  Arbitration.
>
> *      *      *
>
> b.  After the efforts of the parties to obtain an informal resolution of their disagreement have proved to be fruitless and further discussions appear to be pointless, the complaining party may elect to seek arbitration of the parties' disagreement by giving written notice thereof to the other party. If the disagreement is not referred to arbitration within thirty (30) days after the conclusion of the informal resolution process, the complaining party shall be deemed to have waived its rights to pursue any

other remedies with respect to the dispute, including, but not limited to, the right to pursue its legal and equitable remedies or arbitration hereunder.

   c. The parties hereby select the American Arbitration Association (the "AAA") to conduct the arbitration hereunder. Except as expressly provided herein, all arbitration shall be initiated, conducted and governed by the established rules and procedures of the AAA. All arbitration proceedings will be held in the offices of the AAA in Washington, DC. All fees and administrative costs of the arbitration proceeding shall be shared equally, and each party shall bear its own attorneys' fees and expenses in connection therewith. The arbitrator shall be entitled to award damages and may invoke equitable and injunctive relief, including, but not limited to, termination of the Agreement or reformation of its terms and conditions, consistent with the parties' original intent. The arbitrator, however, shall not have the right to assess punitive or exemplary damages and may not make any ruling, finding or award that does not conform to the basic intent of the parties as expressed by the terms and conditions of this Agreement. The findings of the arbitrator shall be non-binding, unless the parties mutually agree in writing in advance thereof to binding arbitration.

   d. Until the completion of the informal resolution and arbitration process, the complaining party will not be entitled to exercise its other legal or equitable remedies. If the parties have agreed to a binding arbitration, the arbitrator's decision shall be final and non-appealable, except as provided in the United States Arbitration Act, 9 U.S.C. § 1, et seq. If the arbitration is non-binding, and if: (i) the arbitrator's findings and decision are unacceptable to the complaining party, for any reason, or (ii) the arbitrator's decision is acceptable to the complaining party, but the other party, for any reason, fails to agree or accept the arbitrator's findings and decisions as final, the complaining party shall then be entitled to exercise any other of its legal or equitable remedies, as permitted by law, including, but not limited to, the right to terminate this Agreement for material breach thereof, or to pursue the recovery of damages.

  15. In Paragraph 4 of the Revenue Pooling Agreement the parties agreed that any arbitration award concerning service adjustments must be binding. Paragraph 4 states, in pertinent part:

4. <u>Service Adjustments.</u>

\*   \*   \*

c.  If, after such conference or conferences, one party reasonably concludes that the performance of the other is such that high levels of service are no longer being maintained and are such as to injure the business value of the Pooled Routes and the parties' disagreement is shown to be incapable of being resolved informally, such party may give written notice to the other that the dispute between the parties *shall* be submitted to *binding* arbitration under the provisions of paragraph 23 of this Agreement.

(Emphasis added.)

16.     Greyhound and Adirondack requested certain relief from the arbitrator that they did not agree to make binding pursuant to Subparagraph 23.d. In addition, Greyhound requested certain relief from the arbitrator that must be binding pursuant to Subparagraph 4.c. Specifically, Greyhound sought an award ordering Adirondack to implement a modern capacity-management model in the Pool.

17.     On October 14, 2015, the Arbitrator issued an award finding that the Revenue Pooling Agreement requires Adirondack to implement a capacity management model. The award states, at Paragraph 319:

I grant Greyhound's claim for an award ordering the Parties to implement a managed capacity model for the Pooled Routes. I further award and direct that the Parties agree, by the end of 2015, on the terms of a managed capacity plan, whose implementation shall thereafter be transitioned over a reasonable period of time to be agreed by the Parties. I further declare that my ruling on Greyhound's claim for termination and for a declaration directing implementation of a managed capacity model is binding within the meaning of Article 4(c) of the [Revenue Pooling Agreement] and that I have the authority to decide that the ruling is binding.

18.     There are no grounds for vacating, modifying, or correcting the binding aspects of the Arbitrator's award. The award was not obtained as a result of corruption, fraud, or undue means, nor did the arbitrator commit any misconduct. Greyhound therefore requests a judgment

against Adirondack requiring that it comply with the Arbitrator's award that the parties institute a managed capacity model.

### C. Ongoing Disputes between Greyhound and Adirondack.

19.     Because the Arbitration award is otherwise nonbinding, the following disputes remain ongoing between Greyhound and Adirondack.

### 1. Adirondack Has Retained Commissions to Which It Is Not Entitled.

20.     Adirondack has breached the Revenue Pooling Agreement intended to facilitate Greyhound's accurate accounting of Pool revenues. As a result of this breach, Adirondack has received over $1.5 million in Pool revenues that it is not due, but that it refuses to repay.

21.     From the beginning of the Pool until 2000, Greyhound and Adirondack each performed their own revenue accounting for sales of Pool tickets. In 2000, Greyhound and Adirondack agreed that Greyhound would assume sole responsibility of performing revenue accounting for both Greyhound's and Adirondack's sales of Pool tickets.

22.     Greyhound accrues revenue from a ticket sale only after the ticket has been redeemed for travel. Therefore, to perform revenue accounting, Greyhound needs two categories of information: (1) sales records and (2) records of redeemed tickets. With respect to the former, Greyhound sells tickets through a centralized system called TRIPS, which maintains sales records. With respect to the latter, bus drivers collect physical tickets from passengers when they board the bus and mail those redeemed tickets to Greyhound's headquarters in Dallas, Texas, where they are digitally imaged and ticket information is electronically extracted and stored. Greyhound can then match the sales records with the redeemed ticket records to accrue revenue.

23.     To fulfill its accounting responsibility for the Pool, Greyhound needed records of Adirondack's Pool ticket sales and redeemed tickets. Greyhound and Adirondack therefore

agreed that Adirondack would begin using Greyhound's TRIPS system to sell Pool tickets and that Adirondack would sell Pool tickets on special Greyhound ticket stock that could be digitally read by Greyhound's imaging software. Adirondack would continue to sell tickets from outside the Pool on its own ticket stock.

24.     To memorialize this agreement, Greyhound and Adirondack executed a Second Amendment to the Revenue Pooling Agreement. It states, in pertinent part:

> Notwithstanding Section 2.a of the [Revenue Pooling Agreement], on or before March 31, 2000, the TRIPS ticketing system will be installed at all automated [Adirondack] terminals or agency stations. Thereafter, all passenger tickets issued by [Adirondack] at its automated locations on the Pooled Routes will be sold using the TRIPS system and [Greyhound] ticket stock. All manual tickets issued by [Adirondack] at manual locations for transportation on the Pooled Routes will be sold using [Greyhound] ticket stock. Additionally, all package express sold by [Adirondack] at all automated or manual locations on the Pooled Routes will continue to be sold using [Greyhound] busbills. All automated and manual ticket sales from locations on the Pooled Routes will be reported and remitted to [Greyhound] and [Greyhound] will account for, settle and remit to [Adirondack] its portion of the Net Pool Revenue.

25.     Following the Second Agreement, Adirondack installed TRIPS at nearly all its ticket-selling locations in the Pool and began to sell Pool tickets on Greyhound ticket stock.

26.     In 2008, Adirondack began selling pool tickets from its website.

27.     In breach of the Second Amendment, Adirondack did not use TRIPS to sell Pool tickets on its website. Greyhound presented Adirondack with software that would allow Adirondack's website to sell Pool tickets through TRIPS, but until recently and only after an arbitration proceeding, Adirondack refused to use that software or any other means of allowing its website to sell tickets through TRIPS.

28.     In further breach of the Second Amendment, Adirondack has never used Greyhound ticket stock for Pool tickets sold on its website. Instead, it issues Pool tickets sold on

its website on its own ticket stock. Adirondack has the technological capability to issue Pool

tickets on the ticket stock required by the Second Amendment, but it has refused to do so.

29.    As a result of Adirondack's refusal to follow Pool protocols for its web sales,

Greyhound's imaging software has incorrectly recorded Pool tickets sold from Adirondack's

website as nonpool "interline" tickets.

30.    Interlining refers to a common practice among intercity bus carriers whereby one

carrier will sell a ticket for a multi-leg trip with a different carrier operating one or more legs of

that trip. It is standard industry practice for the nonoriginating carrier in that situation to collect

the ticket fare for the leg it operates and to pay an interline commission to the originating carrier.

If Adirondack originates a multi-leg ticket outside the Pool with one leg travelling through the

Pool, then the Pool would collect the fare for its leg and pay a interline commission out of Pool

revenues to Adirondack.

31.    Greyhound's imaging software records tickets printed on Adirondack ticket stock

as interline tickets originating outside the Pool because they do not match the requirements for

tickets originating within the Pool. Because Adirondack refused to issue Pool tickets sold on its

website on Greyhound ticket stock, Greyhound's imaging software incorrectly treated those

tickets as interline tickets and Adirondack retained interline commissions that it was not entitled

to. As a result, Adirondack has retained at least $1,507,892 in undue commissions.

32.    Despite demands from Greyhound, Adirondack has refused to repay those

commissions or to comply with the Second Amendment by selling pool tickets on its website

through TRIPS (until very recently) and issuing them on the contractually required ticket stock.

33.    In the Arbitration, Greyhound sought money damages and restitution of the undue

commissions (plus interest), a declaratory judgment that Adirondack is not entitled to

commissions on Pool tickets, a declaratory judgment that Adirondack must sell all pool tickets on the required ticket stock or through TRIPS.

34.     On October 14, 2015, the Arbitrator issued a nonbinding award concluding that Adirondack was not required to sell tickets on its website using TRIPS, but that it is required to sell them on Greyhound ticket stock. The Arbitrator did not, however, issue a declaratory judgment that Adirondack is not entitled to commissions on Pool tickets sold from its website nor did he award Greyhound money damages and restitution of the undue commissions that Adirondack has retained.

35.     Greyhound does not accept the Arbitrator's award and maintains its position that Adirondack is not entitled to commissions on Pool tickets sold from its website and that it must repay the undue commissions that it has retained.

### 2.     Adirondack Failed to Use the Contractually Mandated Formula for Greyhound's Cost Reimbursements.

36.     Greyhound pays certain expenses for the Pool upfront and is supposed to be reimbursed under a formula using actual revenues and expenses. Adirondack, however, has refused to use actual revenue and expenses in that formula and has instead insisted, without justification, that Greyhound be reimbursed based on stale revenues and expenses from nearly a decade ago.

37.     Greyhound and Adirondack agreed in Paragraph 6 of the Revenue Pooling Agreement that they would share the expenses of operating Pool terminals and stations by each "assessing commission charges based on a sales weighted proration of operating expenses."

38.     From the beginning of the Pool until 2000, Greyhound and Adirondack each paid the expenses for its own bus terminals in the Pool and assessed the other party the "commission charges based on a sales weighted proration of operating expenses." In 2000, when Greyhound

assumed accounting responsibilities for the Pool, Greyhound and Adirondack agreed that Greyhound would also assume sole responsibility for paying upfront all the terminal expenses for the Pool and would assess Adirondack the specified "commission charges based on a sales weighted proration of operating expenses." Greyhound and Adirondack thereafter agreed upon a starting percentage for the commissions due to Greyhound using the then-current sales weighted proration of operating expenses for all the terminals in the Pool. They called this rate the "Cost-to-Sell" percentage.

39.     Because revenues and expenses vary over time, the sales weighted proration of operating expenses also varies. Consequently, the Cost-to-Sell percentage must be periodically updated to satisfy the contractual requirement that Greyhound be reimbursed for terminal expenses "based on a sales weighted proration of operating expenses." The current Cost-to-Sell percentage, however, has not been updated since 2007 when it was recalculated to reflect sales and operating expenses from 2006.

40.     Because the Cost-to-Sell percentage has not been updated since 2007, Greyhound has overpaid for the Pool's terminal expenses under the contractually mandated formula in the amount of at least $2,966,034.

41.     Despite demands from Greyhound, Adirondack has refused to reimburse Greyhound for this overpayment or to comply with the Revenue Pooling Agreement by updating the Cost-to-Sell percentage "based on a sales weighted proration of operating expenses."

42.     In the Arbitration, Greyhound sought money damages and restitution of its overpayments plus interest and a judgment requiring Adirondack to engage in good-faith negotiations with Greyhound about prospective calculation of a Cost-to-Sell percentage.

43.     On October 14, 2015, the Arbitrator issued a nonbinding award requiring Greyhound and Adirondack to annually update the Cost-to-Sell percentage going forward and granting Greyhound money damages from its expense overpayments in 2013 and 2014. But the Arbitrator declined to grant Greyhound money damages for years before 2013.

44.     Greyhound disputes the Arbitrator's award insofar as it declines to award Greyhound money damages for years before 2013 and maintains its position that Adirondack must pay damages for Greyhound's expense overpayments dating back to 2007.

       **3.      Adirondack Seeks to Require Greyhound to Pay for a Mileage Imbalance that It Already Cured.**

45.     After decreasing its miles at Adirondack's request, Greyhound paid a contractual per-mile rate to cure its deficiency. Adirondack, however, has demanded higher payments than it is contractually entitled to.

46.     Greyhound and Adirondack agreed in the Revenue Pooling Agreement that each of them would operate a specific percentage of miles in the Pool, but that if one of them falls behind in its allocated percentage, it will have the opportunity to either increase its miles to eliminate the shortfall or to pay the other party a specified per-mile rate to cure the deficiency.

47.     Paragraph 3 of the Revenue Pooling Agreement states, in pertinent part:

    3.  <u>Mileage Operated.</u>

                    *      *      *

      d.  [Adirondack] and [Greyhound] shall operate the percentage of the total bus miles (including regular and extra-section miles) annually over all or any portion of the Pooled Routes as contained in Exhibit 3.

                    *      *      *

      f.  On the three (3) month anniversary date of the commencement of operations pursuant to this Agreement and quarterly thereafter, [Adirondack] and [Greyhound] shall determine whether either of them has operated less than its percentage of the miles during the preceding quarter.

That party experiencing a shortfall shall increase its operations so as to eliminate the shortfall within ninety (90) days of the quarterly review date. If, by the end of such ninety (90) day period the party experiencing the shortfall has not eliminated the shortfall, then such party shall pay the other party for the additional miles it operated during the quarter, at the rate of sixty-five cents ($0.65) per mile without driver and one dollar and ten cents ($1.10) per mile with driver. Each party shall have the right unilaterally to adjust the mileage rates to reflect seasonal and geographic factors on thirty (30) days' written notice to the other party, and such adjusted rates shall apply prospectively on miles operated after their effective date. If a party elects unilaterally to adjust its mileage rates, the other party may, at its sole discretion, identically adjust its mileage rates, to be effective on the same date as the other party's mileage rate adjustment, upon written notice to the other party without the requirement of a thirty (30) day advance written notice.

48.     Beginning in 2011, at Adirondack's request, Greyhound allowed Adirondack to operate more than its allocated percentage of miles because Adirondack needed to increase operations to avoid disputes with its employees' labor union. Pursuant to the Revenue Pooling Agreement, Greyhound paid Adirondack for the additional miles that Adirondack operated at a rate of $2.00 per mile, which is the adjusted rate that Greyhound and Adirondack used at the time for purposes of Subparagraph 3.f. There is no longer any imbalance in Greyhound's miles.

49.     In 2013, Adirondack insisted that Greyhound pay more than the $2.00 per mile required by the Revenue Pooling Agreement to make up for its past mileage imbalance. In an effort to compromise, Greyhound proposed to pay Adirondack at a rate above the contractual rate, but below the rate demanded by Adirondack. Greyhound presented a proposal to Adirondack specifying such a rate and a calculation of the total additional miles operated by Adirondack; however, the parties never reached a final, binding agreement on all the material terms.

50.     In the Arbitration, Adirondack claimed that Greyhound's proposal was a binding contract and sought to obligate Greyhound to pay the proposed rate.

51.     On October 14, 2015, the Arbitrator issued an award finding that Greyhound and Adirondack had entered a binding settlement agreement for the mileage imbalance and awarding Adirondack damages.

52.     Greyhound disputes the Arbitrator's award insofar as it finds a binding contract between Greyhound and Adirondack to settle Greyhound's mileage imbalance and awards Adirondack damages. Greyhound maintains its position that it cured its mileage deficit pursuant to the terms of the Revenue Pooling Agreement and that it did not enter into any binding contract otherwise settling its mileage imbalance.

### 4.     Adirondack Demands a Share of Greyhound's Revenues that It Is Not Contractually Entitled to Receive.

53.     Greyhound and Adirondack agreed in the Revenue Pooling Agreement that they would share ticket revenues in the Pool.

54.     Paragraph 1 of the Revenue Pooling Agreement states, in pertinent part:

1.  <u>Establishment of Pool.</u>

\*          \*          \*

b.   The revenues which shall be the subject of this Agreement ("Gross Pool Revenue") are gross amounts received by [Adirondack] and [Greyhound] from the sale of passenger tickets and package express shipments handled, regardless of where or by whom the tickets were sold or the busbills issued, for the transportation of passengers and express in scheduled, intercity bus service over all or any portion of the Pooled Routes, . . . .

55.     Adirondack demands that Greyhound share income from unredeemed tickets, but its demands have no basis in the parties' long course of performance.

56.     Unredeemed tickets refer to those tickets that are purchased by a customer but never redeemed for travel, refunded, or reissued. Since Greyhound and Adirondack entered the

Revenue Pooling Agreement in 1997, neither Greyhound nor Adirondack has ever treated income from unredeemed tickets as Gross Pool Revenue and shared it with the other party.

57.     Recently, Adirondack has demanded that Greyhound must include income from unredeemed tickets in Gross Pool Revenue and report the amount of its income from unredeemed tickets to Adirondack. Adirondack's demand is contradicted by its own course of performance of the Revenue Pooling Agreement and by the realities of revenue accounting.

58.     In the Arbitration, Greyhound sought a judgment rejecting Adirondack's claim that Greyhound must account for revenue from unredeemed tickets and fees as Gross Pool Revenue and its request that Greyhound pay damages to Adirondack.

59.     On October 14, 2015, the Arbitrator issued a nonbinding award denying Adirondack's claim for damages from unredeemed ticket revenue, but declaring that unredeemed ticket revenue must be included in Gross Pool Revenue and shared between Greyhound and Adirondack in the future.

60.     Greyhound disputes the Arbitrator's award insofar as it requires Greyhound to include income from unredeemed tickets in Gross Pool Revenue in the future and maintains its pre-arbitration position that income from unredeemed tickets should not be shared between the parties.

### 5.     Adirondack Refuses to Remit Certain Non-Pool Revenues Due to Greyhound.

61.     Adirondack acts as a ticket selling agent on Greyhound's behalf at certain locations outside the Pool but refuses to remit all of the revenue from those sales to Greyhound.

62.     Greyhound and Adirondack have entered a Tariff Participation Agreement that allows Greyhound to set fares and charge fees on Greyhound tickets sold by Adirondack.

Pursuant to that agreement, Adirondack must charge Greyhound customers a "facility fee" on non-Pool tickets.

63.     Adirondack collects the facility fees on the tickets it sells on Greyhound's behalf, but it has refused to remit those fees to Greyhound. Adirondack has retained at least $325,725 in facility fees that it should have remitted to Greyhound.

64.     Despite demands from Greyhound, Adirondack has refused to remit that amount to Greyhound or to remit facility fees to Greyhound on an ongoing basis.

65.     In the Arbitration, Greyhound sought money damages and restitution of the facility fees retained by Adirondack plus interest and a declaratory judgment Adirondack must remit facility fees that it collects on Greyhound's non-Pool tickets.

66.     On October 14, 2015, the Arbitrator issued a nonbinding award in favor of Greyhound and awarded Greyhound damages of $245,575 plus interest.

67.     Greyhound agrees with the Arbitrator's award, but, on information and belief, Adirondack disagrees with the Arbitrator's award.

**COUNT ONE**

**- Petition to Confirm Arbitration Award under 9 U.S.C. § 9 -**

68.     Greyhound incorporates all of the forgoing paragraphs as if fully set forth in this Count One.

69.     Greyhound and Adirondack contractually agreed that disputes about contested service adjustments "shall be submitted to binding arbitration." By that agreement, Greyhound and Adirondack intended for arbitration to be the exclusive, final, and binding remedy on issues related to their provision of services in the pool.

70.     Greyhound sought an arbitration award against Adirondack ordering Adirondack to implement a modern capacity-management model in the Pool.

71.     On October 14, 2015, the Arbitrator issued a binding award in favor or Greyhound ordering Adirondack to implement a capacity-management model in the Pool. The award states:

> I grant Greyhound's claim for an award ordering the Parties to implement a managed capacity model for the Pooled Routes. I further award and direct that the Parties agree, by the end of 2015, on the terms of a managed capacity plan, whose implementation shall thereafter be transitioned over a reasonable period of time to be agreed by the Parties. I further declare that my ruling on Greyhound's claim for termination and for a declaration directing implementation of a managed capacity model is binding within the meaning of Article 4(c) of the [Revenue Pooling Agreement] and that I have the authority to decide that the ruling is binding.

72.     Greyhound requests that the Court confirm the award regarding managed capacity and enter judgment in favor of Greyhound that Adirondack implement a modern capacity-management model in the Pool.

## COUNT TWO
### - Breach of Contract -

73.     Greyhound incorporates all of the foregoing allegations as if fully restated in this Count Two.

74.     The Second Amendment to the Revenue Pooling Agreement requires Adirondack to sell Pool tickets using TRIPS at all automated locations and to sell all Pool tickets using "[Greyhound] ticket stock."

75.     Adirondack has breached the Second Amendment to the Revenue Pooling Agreement by selling tickets on its website without using TRIPS and without using "[Greyhound] ticket stock."

- 17 -

76.     Greyhound has suffered damages as a foreseeable result of Adirondack's breach in the form of at least $1,507,892 in interline commissions that Adirondack obtained by failing to use "[Greyhound] ticket stock" for tickets sold from its website.

77.     An actual and present controversy exists between Greyhound and Adirondack concerning whether the Second Amendment to the Revenue Pooling Agreement requires Adirondack to sell tickets on its website using TRIPS.

WHEREFORE Greyhound demands:

(i)      money damages in the amount of at least $1,507,892, plus interest;

(ii)     a declaratory judgment that Adirondack is in material breach of the Second Amendment to the Revenue Pooling Agreement;

(iii)    costs and expenses for this action; and

(iv)     such other legal and equitable relief as the Court deems just and proper.

## COUNT THREE
### - Unjust Enrichment -

78.     Greyhound incorporates all of the foregoing allegations as if fully restated in this Count Three.

79.     Adirondack has retained from Greyhound at least $1,507,892 in interline commissions that it is not entitled to.

80.     Adirondack has been unjustly enriched by obtaining those amounts and it would be inequitable for Adirondack to keep them.

WHEREFORE Greyhound demands:

(i)      judgment against Adirondack for restitution in the amount of at least $1,507,892, plus interest;

    (ii)    costs and expenses for this action; and

    (iii)    such other legal and equitable relief as the Court deems just and proper.

**COUNT FOUR**

**- Breach of Contract -**

81.    Greyhound incorporates all of the foregoing allegations as if fully restated in this Count Four.

82.    The Revenue Pooling Agreement requires that Greyhound and Adirondack share the expenses of operating terminals and stations in the Pool by each "assessing commission charges based on a sales weighted proration of operating expenses."

83.    Adirondack has breached the Revenue Pooling Agreement by refusing to share the expenses of operating terminals and stations in the Pool "based on a sales weighted proration of operating expenses."

84.    Greyhound has suffered damages as a foreseeable result of Adirondack's breach in the form of at least $2,966,034 in terminal and station expenses that Greyhound paid over its contractual share.

85.    An actual and present controversy exists between Greyhound and Adirondack concerning whether Adirondack must share the expenses of operating terminals and stations in the Pool "based on a sales weighted proration of operating expenses."

WHEREFORE Greyhound demands:

    (i)    a declaratory judgment that Adirondack is in material breach of the Revenue Pooling Agreement;

    (ii)    money damages in the amount of at least $2,966,034, plus interest;

    (iii)    costs and expenses for this action; and

(iv)     such other legal and equitable relief as the Court deems just and proper.

## COUNT FIVE
### - Quantum Meruit -

86.     Greyhound incorporates all of the foregoing allegations as if fully restated in this Count Five.

87.     Greyhound provided a benefit to Adirondack by paying for the expenses for terminals and stations on the Pool.

88.     Adirondack accepted that benefit.

89.     Greyhound reasonably expected that Adirondack would pay a percentage of those expenses "based on a sales weighted proration of operating expenses."

90.     Adirondack has not paid for a percentage of those expenses "based on a sales weighted proration of operating expenses."

WHEREFORE Greyhound demands:

(i)     judgment against Adirondack for payment in the amount of at least $2,966,034, plus interest;

(ii)     costs and expenses for this action; and

(iii)     such other legal and equitable relief as the Court deems just and proper.

## COUNT SIX
### - Unjust Enrichment -

91.     Greyhound incorporates all of the foregoing allegations as if fully restated in this Count Six.

92.     Adirondack has failed to pay Greyhound at least $2,966,034 for its share of the expenses of operating terminals and stations in the Pool.

93.     Adirondack has been unjustly enriched by retaining those amounts and it would be inequitable Adirondack it to keep them.

WHEREFORE Greyhound demands:

(i)     judgment against Adirondack for restitution in the amount of at least $2,966,034, plus interest;

(ii)    costs and expenses for this action; and

(iii)   such other legal and equitable relief as the Court deems just and proper.

## COUNT SEVEN
### - Declaratory Judgment -

94.     Greyhound incorporates all of the foregoing allegations as if fully restated in this Count Seven.

95.     Adirondack claims that Greyhound must pay Adirondack for a mileage imbalance that accrued between 2011 and 2013.

96.     Greyhound has already cured all past mileage imbalances pursuant to the terms of the Revenue Pooling Agreement and has no current imbalance.

97.     An actual and present controversy exists between Greyhound and Adirondack concerning whether Greyhound owes Adirondack money as a result of past mileage imbalances.

WHEREFORE Greyhound demands:

(i)     a declaratory judgment that Greyhound does not owe any money to Adirondack for a mileage imbalance and that Greyhound has cured all past mileage imbalances;

(ii)    costs and expenses for this action; and

(iii)   such other legal and equitable relief as the Court deems just and proper.

## COUNT EIGHT

### - Declaratory Judgment -

98.     Greyhound incorporates all of the foregoing allegations as if fully restated in this Count Eight.

99.     Adirondack claims that Greyhound must include income from unredeemed tickets in Gross Pool Revenue and share it with Adirondack.

100.    Greyhound is not required to include income from unredeemed income in Gross Pool Revenue and share it with Adirondack.

101.    An actual and present controversy exists between Greyhound and Adirondack concerning whether Greyhound must include income from unredeemed tickets in Gross Pool Revenue.

WHEREFORE Greyhound demands:

(i)     a declaratory judgment that Greyhound is not required to include income from unredeemed tickets in Gross Pool Revenue and share it with Adirondack;

(ii)    costs and expenses for this action; and

(iii)   such other legal and equitable relief as the Court deems just and proper.

## COUNT NINE

### - Breach of Contract -

102.    Greyhound incorporates all of the foregoing allegations as if fully restated in this Count Nine.

103.    Adirondack has agreed to sell Greyhound's nonpool tickets as Greyhound's agent at certain locations outside the Pool and to remit the ticket revenues and fees from those sales to Greyhound.

104.   Adirondack has breached that agreement by refusing to remit to Greyhound the facility fees that Adirondack collects on sales of Greyhound tickets.

105.   Greyhound has suffered damages as a foreseeable result of Adirondack's breach in the form of at least $325,725 in facility fees that Adirondack should have remitted to Greyhound.

106.   An actual and present controversy exists between Greyhound and Adirondack concerning whether Adirondack must remit facility fees to Greyhound when it sells Greyhound's tickets outside the Pool

WHEREFORE Greyhound demands:

(i)   a declaratory judgment that Adirondack must remit to Greyhound all revenues and fees, including facility fees, when it sells a ticket as Greyhound's agent outside the Pool;

(ii)   an injunction requiring Adirondack to remit to Greyhound all revenues and fees, including facility fees, when it sells a ticket as Greyhound's agent outside the Pool;

(iii)   money damages in the amount of at least $325,725, plus interest;

(iv)   costs and expenses for this action; and

(v)   such other legal and equitable relief as the Court deems just and proper.

## COUNT TEN
### - Unjust Enrichment -

107.   Greyhound incorporates all of the foregoing allegations as if fully restated in this Count Ten.

108.    Adirondack has retained at least $325,725 in facility fees that should have been remitted to Greyhound.

109.    Adirondack has been unjustly enriched by retaining those amounts and it would be inequitable for Adirondack to keep them.

WHEREFORE Greyhound demands:

(i)    judgment against Adirondack for restitution in the amount of at least $325,725, plus interest;

(ii)    costs and expenses for this action; and

(iii)    such other legal and equitable relief as the Court deems just and proper.


Respectfully submitted,

Greyhound Lines, Inc.,
by its attorneys

  /s/ J. Emmett Murphy
J. Emmett Murphy (Bar # JM3178)
**KING & SPALDING** LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: 212 556 2191
Facsimile: 212 556 2222
jemurphy@kslaw.com

Bobby Burchfield
Johnny Walker
**KING & SPALDING** LLP
1700 Pennsylvania Avenue, NW, Suite 200
Washington, District of Columbia 20006
Telephone: 202 626 5524
Facsimile: 202 626 3737
bburchfield@kslaw.com
jhwalker@kslaw.com

Dated: October 14, 2015